IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
March 8, 2016 Session

**STATE OF TENNESSEE v. CHAD RAY THOMPSON**

**Appeal from the Circuit Court for Warren County**
**No. F-13595    Larry B. Stanley, Jr., Judge**
_____

**No. M2015-01534-CCA-R3-CD – Filed December 1, 2016**
_____

Chad Ray Thompson ("the Defendant") was indicted by the Warren County Grand Jury for one count of first degree premeditated murder, one count of first degree felony murder, and one count of especially aggravated robbery in connection with the death of his cousin, Tracy Allen Martin ("the victim"). Following a jury trial, the Defendant was convicted of first degree premeditated murder, first degree felony murder, and facilitation of especially aggravated robbery. On appeal, the Defendant argues that there was insufficient evidence to show premeditation for his first degree premeditated murder conviction and that there was insufficient evidence to prove the underlying felony of especially aggravated robbery for his first degree felony murder conviction. Upon review, we conclude that the Defendant is not entitled to relief. Accordingly, the judgments of the trial court are affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

THOMAS T. WOODALL, P.J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and CAMILLE R. MCMULLEN, JJ., joined.

Robert S. Peters, Winchester, Tennessee, for the appellant, Chad Ray Thompson.

Herbert H. Slatery III, Attorney General and Reporter; M. Todd Ridley, Assistant Attorney General; Lisa Zavogiannis, District Attorney General; and Randall Gilliam and Thomas Miner, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

*Trial*

Tonya Debuty, the victim's sister, testified that the victim was "like a child to [her.]" She explained that the victim suffered from bipolar disorder, obsessive compulsive disorder, and "a form of schizophrenia[.]" The victim lived in a camper

located on Ms. Debuty's property in Etowah for three years. The victim was unable to maintain employment, so Ms. Debuty helped the victim enroll for Social Security disability benefits. Ms. Debuty also had power of attorney to manage the victim's finances and was designated as the payee for his disability benefits. The victim eventually was awarded a lump sum disability payment of about $20,000.

The victim eventually moved to McMinnville, where he lived with Ms. Debuty's ex-husband and his sister, Ozella Craven. He later moved in with his aunt, Teresa Thompson. After the victim had moved, he called Ms. Debuty and asked for the remainder of his lump sum disability payment. Ms. Debuty stated that about $12,000 remained from the lump sum payment. She explained to the victim that she was responsible for his money and that she "couldn't just give it to him[.]" After speaking with representatives for the Social Security Administration, Ms. Deputy turned the money over to Social Security until a new payee could be appointed. Eventually, Ms. Craven was appointed as the new payee.

Sometime later, Ms. Debuty received a call from Ms. Thompson informing her that the victim was missing and inquiring as to the whereabouts of the victim's money. During that conversation, Ms. Debuty also spoke with the Defendant, who asked about the whereabouts of the victim's money. On cross-examination, Ms. Debuty acknowledged that she knew the victim "had a methamphetamine habit" and that "he was hanging around with the wrong kind of people[.]"

Ozella Craven testified that the victim "showed up at [her] house" approximately one to two weeks before his death. Ms. Craven understood that the victim wanted to move to the McMinnville area to be closer to his children. Ms. Craven stated that she agreed to serve as payee for the victim's disability benefits. In that capacity, Ms. Craven received a check in the amount of $11,711.12 made out to the order of herself and the victim. Ms. Craven cashed the check and gave the money to the victim. The victim counted out $1,300 and gave the rest back to Ms. Craven. Ms. Craven clarified that she did not count the money the victim had given her and did not know how much he actually took; she simply trusted him when he said that he took $1,300. Ms. Craven then took the victim to a gas station so he could buy a can of gas to take back to his vehicle. The victim told Ms. Craven that he was going to his aunt, Teresa Thompson's, house "to take them out to eat." The victim returned the next day.

Ms. Craven said she had bought the victim a handgun and a television using the money from his check. Ms. Craven gave the victim the gun when he returned, and the victim went with the Defendant, his cousin, to pick up the television. The victim then returned to Ms. Craven's house the next day asking for more money. He said he wanted to rent a U-Haul and that the Defendant was going to help him "pack up his stuff and put it on a U-Haul and bring it down here." Ms. Craven again saw the victim the next day at

Wal-Mart. He was wearing a yellow and black jacket, blue jeans, and a black shirt with purple writing. Ms. Craven did not see the victim again after that.

Ms. Craven learned the victim was missing when Ms. Thompson called to tell her that the victim had left her house with his money, gun, and two boxes of Sudafed and that she was worried. Ms. Craven also recalled that she saw the Defendant at the victim's funeral. There, the Defendant told Ms. Craven that the victim had said he kept his money in a lock-box at Ms. Craven's home, and he asked Ms. Craven if she still had it.

Theresa Thompson testified that the victim was her nephew and that the Defendant was her son. She also stated that she called to report the victim missing. On cross-examination, Ms. Thompson said that she did not know of any "bad blood" between the victim and the Defendant. Ms. Thompson recalled that the victim brought a gun into her home, which made Ms. Thompson uncomfortable. She asked the victim to remove the gun from her house, and she did not see him again after he left.

Officer Brad Hall of the McMinnville Police Department testified that he responded to a missing person call. When he arrived at the caller's residence, he spoke with the Defendant and the victim's aunt. Officer Hall stated that he did not take a formal report because the Defendant gave Officer Hall the impression that "it wasn't unlike [the victim] to just pick up and move, leave town." Officer Hall issued a "be on the lookout" ("BOLO") call for the victim.

Eddie Youngblood testified that he and his son went fishing in Warren County in November of 2011. While they were fishing, he and his son noticed something that appeared to be the bottom half of a body on the bank. Mr. Youngblood initially thought it was a mannequin or "one of them blow-up dolls[.]" However, as he and his son approached the object, they discovered that it was a dead body and immediately called 911.

Jason Rowland, an investigator for the State, testified that he responded to the scene after the 911 call. Investigator Rowland testified that the victim was found on a farm, roughly half a mile away from the road and that the scene could not be observed from the road. The victim was wearing a yellow shirt, blue "jogging pants[,]" and a wedding band. Once the victim was removed from the water, Investigator Rowland checked his pockets for personal belongings and found that the victim had "absolutely nothing on him other than that wedding band and a watch[.]" Investigator Rowland also discovered that the victim had "some severe injuries to his head." The victim was transported to the hospital and then to the medical examiner for an autopsy. Investigator Rowland had also obtained the BOLO information for the victim before he went to the scene. Based on the information contained in the BOLO, Investigator Rowland searched

the area for cash, a gun, and the victim's wallet and driver's license but found none of these items.

During the course of his investigation, Investigator Rowland learned that the victim was last seen at Wal-Mart. Investigator Rowland viewed the security footage from Wal-Mart from the day the victim went missing. The video showed the victim enter Wal-Mart wearing a yellow sweatshirt and navy blue jogging pants and purchase with cash a box of Winchester .38 Special target ammunition and a laser sight.

Investigator Rowland also interviewed Scott Muncey and Destry Cobb about the victim's death. Investigator Rowland took a statement from Buford Tucker, who passed away prior to the trial. Mr. Tucker's statement said:

> Sometime in November Destry Cobb sold me a .38 Special with a [two]-inch barrel. It was a Charter Arms. I gave him $130.00 for it and I sold it to Wendell Smartt. He came back about a week or so later and wanted to get it back. He wanted to burn it or melt it down. He said it was involved in something bad. I told him Wendell had it in Beersheba and not to worry about it.

Investigator Rowland then met Wendell Smartt and obtained the .38 Special Charter Arms revolver.

Destry Cobb testified that he lived with Scott Muncey and that he was a friend of the Defendant. Mr. Cobb admitted that he had prior charges for manufacturing a controlled substance and assault. Mr. Cobb recalled that the Defendant would visit his apartment "[a]t least every other day." Around November 2011, the Defendant asked Mr. Cobb and Mr. Muncey to "help[] him rob somebody." The Defendant told Mr. Cobb that the intended target had $30,000 and that he planned to rob the target at Harrison Ferry. When asked how the robbery would happen, Mr. Cobb said, "I believe in a moving truck. They would be together. He asked us to assault him also and make it look good and that was pretty much the details." Mr. Cobb refused to help the Defendant.

Mr. Cobb also recalled that, the day after his conversation with the Defendant, Mr. Muncey called him "and said that he had a gun for $75 that it was a .38." Mr. Cobb then called his uncle, Buford Tucker, who agreed to buy the gun for $135. The Defendant brought the gun to Mr. Cobb's apartment, and Mr. Cobb gave him $75. During the transaction with the Defendant, Mr. Cobb spoke with the Defendant about the murder, and Mr. Cobb recalled, "[The Defendant] told me it got out of hand one time and another time he told me that he had kill him." Mr. Cobb also recalled that he paid the Defendant cash for the gun and that the Defendant had approximately $1,000 in cash in his wallet at that time. Mr. Cobb stated that he never knew the Defendant to have that much money

- 4 -

on him. Mr. Cobb, in turn, sold the gun to Mr. Tucker for the agreed-upon $135. Later, Mr. Cobb learned that a body had been found in a river, and he worried that the person may have been killed with the .38 he had sold to Mr. Tucker, and he tried to get the gun back so that his uncle did not get into trouble.

Mr. Cobb confirmed that he had spoken with police and that the Defendant had called him during that interview. That phone call was recorded. During that phone call, Mr. Cobb told the Defendant that the police had been to Mr. Tucker's house looking for Mr. Cobb. He also told the Defendant that investigators had already picked up the gun from Mr. Tucker. The Defendant said he did not want to talk on the phone, which Mr. Cobb understood to mean the Defendant was nervous.

On cross-examination, Mr. Cobb admitted that he had a prior conviction for manufacture, delivery, or sale of methamphetamine and that he still used methamphetamine at the time of trial. Mr. Cobb stated that he was afraid that Mr. Muncey would be charged in connection with the victim's death. Mr. Cobb also admitted that he used methamphetamine the day before the Defendant asked for assistance in the robbery. Mr. Cobb confirmed that he had not been charged with the offense of methamphetamine use or felon in possession of a handgun for his actions around the time of the victim's death. Mr. Cobb also admitted that methamphetamine use impaired his memory. Mr. Cobb affirmed that he did not speak with police until February 6, 2012. He explained the he delayed speaking with people because "[n]o one was in trouble." Mr. Cobb denied telling someone named Jamie Nichole Powell "that she needed to keep her mouth shut or she [would] be found in the river like Tracy [Martin]."

Scott Muncey testified that he had known the Defendant for approximately fifteen years. Mr. Muncey stated that Mr. Cobb was living with him in November 2011. Mr. Muncey estimated that Mr. Cobb lived with him for five to six months, but he could not state specifically how long Mr. Cobb lived with him because he was using methamphetamine at the time, which caused his concept of time to "blur[]." However, Mr. Muncey recalled that, in November 2011, the Defendant told him that he "knew someone that was getting a $35,000 settlement" and who liked methamphetamine. The Defendant told Mr. Muncey that he planned to steal the money and make it appear as if a drug deal had gone bad. Mr. Muncey later learned that the intended target was the Defendant's cousin.

The Defendant asked for Mr. Muncey's and Mr. Cobb's assistance in robbing the victim, but Mr. Muncey refused. The Defendant became angry and left. A short time later, the Defendant returned and told Mr. Muncey that the intended victim "was only going to have five grand on him" and that they needed to act quickly because "his cousin [was] going through the money." Mr. Muncey again refused to participate in the planned

robbery. The Defendant responded that "he'd just go kill him then and do it himself." The Defendant left angry.

"[A] couple or three days" after that conversation, the Defendant sent Mr. Muncey a photo of a .38 Special, and Mr. Muncey agreed to purchase the gun. Mr. Muncey planned to sell the gun to a man he knew as "Uncle." Mr. Muncey paid seventy-five dollars for the gun, and Mr. Cobb acted as "the middle man" in the transaction. At the time of the transaction, Mr. Muncey was not aware of the gun "being involved in anything."

A few days after the transaction, the Defendant came to Mr. Muncey's apartment dressed "in his Sunday best[.]" The Defendant told Mr. Muncey that he was on his way to his cousin's funeral. The Defendant also told Mr. Muncey that he had "thr[own] a hammer beside [Mr. Muncey's] apartment" and that "he needed to find it because it ha[d] his old lady's initials on it." Mr. Muncey did not understand why the Defendant was talking about a hammer, and he "felt like [the Defendant] maybe was setting [him] up for something." Mr. Muncey also reported that "the girl" found a pair of coveralls and a pair of slippers in his apartment and that "the girl" said she had seen the Defendant wearing them. "The girl" is not identified in the record. Mr. Muncey stated that the clothes were sized "at least 4X, 3 to 4X" and did not fit him. Additionally, after the gun transaction, Mr. Muncey noticed that the Defendant began to visit him more often and for longer periods of time, and Mr. Muncey felt that the Defendant was "keeping an eye on [him.]" Mr. Muncey called his stepfather and told him that he was concerned that "dude's setting me up for murder." Mr. Muncey and his stepfather searched the area around Mr. Muncey's apartment for a hammer but did not find one.

Mr. Muncey also recalled that he asked the Defendant if anyone else knew what the Defendant had done, and the Defendant responded that only he and Mr. Muncey knew what happened. Mr. Muncey noted that the Defendant never explicitly said that he killed his cousin. However, Mr. Muncey "put it together" when he learned that the Defendant's cousin bought a .38 Special, which Mr. Muncey understood to be the same gun the Defendant sold him. Additionally, the Defendant admitted that he "pushed him over" and "said a statement like, [']you don't know what it feels like to feel a man's, like his bones crush underneath your fists[.']"

Mr. Muncey admitted that he was currently serving time for felon in possession of a handgun. Mr. Muncey stated that he knew the consequences of his having a gun, but he explained that he got the gun to protect himself from the Defendant. Mr. Muncey also admitted that he did not contact law enforcement even though he thought the Defendant was setting him up for the murder. Mr. Muncey explained he was afraid the Defendant would learn he had contacted law enforcement and would retaliate against Mr. Muncey's

family. Mr. Muncey also admitted that he spoke to law enforcement after he was arrested in an attempt to receive leniency.

On cross-examination, Mr. Muncey stated that he was arrested after police executed a search warrant at his apartment and discovered "a couple of guns." Mr. Muncey also admitted that he did not talk to law enforcement until after the search warrant was served. Mr. Muncey eventually pled guilty to the firearms charge, and his testimony for this case was "[taken] under consideration" during the plea. Mr. Muncey admitted that he would like to have his sentence reduced as a result of his testimony in this case. Additionally Mr. Muncey stated that he had been addicted to methamphetamine for "a very long time" and that he made his own methamphetamine. However, Mr. Muncey said he had never met the victim and that he was not aware that the victim's autopsy revealed that he had methamphetamine in his system.

David George, Mr. Muncey's stepfather, testified that he worked in landscaping. Around January 2012, Mr. Muncey asked Mr. George to "do some work" around the apartment complex where Mr. Muncey lived and worked. On February 1, 2012, Mr. George received a call informing him that police were at Mr. Muncey's apartment. Mr. George went to Mr. Muncey's apartment, where he saw the Defendant and his girlfriend. Mr. George was surprised to see the Defendant there. The Defendant asked what was going on, and Mr. George responded that Mr. Muncey had been arrested on a gun charge. Mr. George recalled that the Defendant appeared concerned and "wanted to know what kind of gun it was[.]" Over the following week, Mr. George packed up Mr. Muncey's belongings and placed them into storage. During that time, the Defendant came to Mr. Muncey's apartment "[f]ive or six times" and asked what Mr. Muncey had been charged with.

Debbie George, Mr. Muncey's mother, testified that, on the night Mr. Muncey was arrested, the Defendant and his girlfriend came to Mrs. George's house. The Defendant said he had come to pay his respects to Mrs. George and also to give her the "phone chip" out of Mr. Muncey's phone. The Defendant told Mrs. George that the card had contained some photos but that he had erased everything that was on there. Mrs. George gave the "phone chip" to investigators when they came to her house. The Defendant also asked Mrs. George about a pistol. Mrs. George recalled that, after Mr. Muncey's arrest, she and Mr. George packed up Mr. Muncey's belongings.

Captain James Ramsey testified that he accompanied officers to Ms. Thompson's apartment to inform her that the victim's body had been found. While there, Captain Ramsey took photographs of the victim's car. The Defendant's sister also gave Captain Ramsey the victim's car keys and cell phone. The next day, Captain Ramsey interviewed the Defendant's mother, Ms. Thompson, at her apartment. During the interview, the Defendant came into the apartment "very irate." He "starting screaming" and asked why

the police were interrogating his mother. The Defendant also tried to view the notes that Captain Ramsey was taking during the interview. Captain Ramsey also recalled that he retrieved a phone SD card from Debbie George but that he was unable to retrieve any information from the SD card.

Mary Alvarado testified that she worked at Perry's Country Market. Ms. Alvarado noted that the Defendant had come to her store around 5:00 p.m. on November 17, 2011, and paid for his purchase with a $100 bill. Ms. Alvarado also recalled that a police deputy walked into the store while the Defendant was there and that it appeared that the Defendant knew the deputy. Ms. Alvarado stated that the Defendant seemed friendly with the deputy but appeared to be nervous.

Chief Investigator Marc Martin of the Warren County Sheriff's Department testified that he interviewed the victim's sister the day after the victim's body was discovered. At the time of the interview, law enforcement had not released information about the manner of the victim's death, where his wounds were located, or what type of wounds they were, and Investigator Martin did not give those details to the victim's sister. During the interview, Investigator Martin asked the victim's sister to make a phone call to the Defendant, which was recorded. Specifically, Investigator Martin instructed the victim's sister "to see if she could find out where the body was discovered and if [the Defendant] knew any information about how [the victim] was killed." During that conversation, the Defendant told the victim's sister that the victim had sustained injuries to the back of his head. Additionally, the Defendant knew that the police had taped off the location where the victim's body was found. Investigator Martin explained that you could not see the tape from the road, so in order to know that information, the Defendant would have "had to [drive] nearly a half mile through this nursery field to see that [the police] had the crime scene taped off." At the time of the phone call, the only information about the victim that he been released was "a generic statement that was put on the radio about a body being found off of Red Road." However, the statement contained "no detailed information in it whatsoever." Investigator Martin noted that the Defendant's knowledge about the crime scene and injuries was a "red flag[.]"

Investigator Martin stated that it was unusual that, during the course of the investigation, wherever Investigator Martin went, the Defendant "would be lurking in the shadows." Investigator Martin recalled, "[The Defendant] would be just maybe a hundred yards away from us in a parking lot watching us or pull right up close to where we was at [sic] trying to figure out what was going on, who we were talking to[,] and what we were finding out." Once, Investigator Martin approached the Defendant and "talked to him for just a second[.]" During this encounter, the Defendant appeared nervous and "was just shaking all over." The Defendant' demeanor was also a "red flag[.]"

The Defendant also had Investigator Martin's cell phone number and called him numerous times during the investigation. Investigator Martin was able to record some of those calls, which were played for the jury. In one call, the Defendant was upset because police "had talked to his girlfriend and [executed] a search warrant on his vehicle and had taken his vehicle." The Defendant had called Investigator Martin in order to try to "milk [the investigator] for information about the case."

Investigator Martin recalled that federal agents "raid[ed]" Scott Muncey's apartment on February 1, 2012. Investigator Martin participated in that operation by "circling the area during that time." While he was circling the area, Investigator Martin saw the Defendant park his car in the parking lot across from Mr. Muncey's apartment and watch the officers conduct the raid. The Defendant stayed there until police left. Investigator Martin noted that, after Mr. Muncey was arrested, "it was like [the Defendant] disappeared." The Defendant stopped calling Investigator Martin, and police no longer saw him when they conducted interviews in connection with the case. Additionally, Investigator Martin recalled the Defendant changed his phone number after Mr. Muncey was arrested, and it was difficult for police to locate him.

On cross-examination, Investigator Martin acknowledged that the people who found the body could have told others what they knew. However, Investigator Martin noted that the people who discovered the body did not know the victim's manner of death. That information was not uncovered until the autopsy had been completed. Investigator Martin also acknowledged that, in the phone call with the victim's sister, the Defendant repeated the rumor that the victim had been shot in the head. Investigator Martin confirmed that the victim was not shot. Investigator Martin also acknowledged that there would not have been crime scene tape present when the crime was committed, so the Defendant's comment about crime scene tape could indicate that he had seen the crime scene after police arrived at the scene.

Investigator Martin also stated that the victim's autopsy revealed that he had methamphetamine in his system, and he acknowledged that both Mr. Cobb and Mr. Muncey were "in the meth business[.]" Investigator Martin stated that he believed the victim was killed at the scene after being taken there in the Defendant's car. However, Investigator Martin noted that the Defendant's vehicle had been searched and there was no evidence that the victim had been inside the Defendant's vehicle. Additionally, there was no evidence that a truck had been driven to the crime scene. Investigator Martin confirmed that he "looked into" Mr. Cobb and Mr. Muncey in connection with the victim's murder. Investigator Martin noted that a hammer, which tested positive for blood, had been found in the woods near Mr. Muncey's apartment. However, testing was not able to match the DNA evidence to the victim or any other individual. Investigator Martin noted that the hammer was found several months after the victim died and that exposure to the elements "would have destroyed that evidence."

Investigator Steven Carpenter of the Warren County Sheriff's Department testified that he went to the apartment complex where the Defendant lived to pick up the Defendant's sister. On that same day, police had interviewed the Defendant's sister and girlfriend and searched his vehicle. As Investigator Carpenter pulled up the apartments in an unmarked police car, someone at the apartment complex told them that "a guy took off running." Investigator Carpenter and two other officers walked in the direction where the man had pointed. They saw the Defendant standing in a breezeway. The Defendant saw the officers and "took off running" again, and the officers gave chase. They eventually found the Defendant "ducked down in the weeds and bushes." Investigator Carpenter asked the Defendant why he ran, and the Defendant responded, "[Y]'all are here to get me."

Investigator Rowland was recalled and testified that he was present when the hammer was found in a wooded area outside of Mr. Muncey's apartment. Investigator Rowland noted that it was a sledge hammer with "Nina" scratched into the head of the hammer. Investigator Rowland noted that the Defendant's girlfriend's name was Nina Parker. Presumptive tests of the hammer revealed the presence of blood. However, the tests failed to indicate the presence of human DNA, so no DNA profile was obtained. Investigator Rowland noted that the hammer was found outside and that it had been exposed to the elements "for some period of time."

As part of his investigation, Investigator Rowland intercepted mail sent between the Defendant and Ms. Parker while the Defendant was in jail. In one letter, the Defendant wrote to Ms. Parker:

> Do you remember me sayin[g] something about what might be in the short weeds over by[] you know where? See if you can get that one guy that is like lighting [sic] in the woods [to] go over there [and] look around. Get rid of it, only cause it[']s got [your] name on it. It just needs [to] be found. If they would have found it then we would've already known. He tossed it by the trailer that was once used [for] an office. J-Pa's pond/lake would be a good place [for] it.

Investigator Rowland also listened to recorded phone calls the Defendant placed from the jail to Ms. Parker. In one phone call, the Defendant asked Ms. Parker if she remembered "what [he] told [her] at, remember in the weeds?" He also told her to tell her "daddy [to] go look" and to look "thoroughly." He also noted that the object was "just right up there out of the way[.]" In another call, the Defendant told Ms. Parker to "call [her] daddy . . . about what [he] was [sic] telling [her] yesterday[.]" He also instructed her to "tell him to put a sticker on the window saying it's out of gas or something." He also instructed Ms. Parker to call her father immediately after she hung up with the Defendant to "get him on it." In another call, the Defendant instructed Ms. Parker to call her father and say she had

something to tell him. He also told Ms. Parker, "Your name's on it. Your name's all over that toilet paper." He then said, "Hell, I just want a motherf—r to g—damn find that roll of toilet paper, by God, just like you're fixing to find that roll of toilet paper, you know?" Ms. Parker responded, "Supposedly they've already got it," to which the Defendant responded, "Oh, s—." Investigator Rowland stated that he did not think the Defendant was actually talking about a roll of toilet paper in the last conversation.

On cross-examination, Investigator Rowland stated that he followed up on leads involving Mr. Cobb during the course of the investigation. However, he said he never interviewed Mr. Muncey. Based on his investigation, Investigator Rowland believed that the victim was killed at the scene where he was found. Investigator Rowland acknowledged that the Defendant's letter said, "He tossed it by the trailer," but he did not know who the Defendant was referring to when he said, "he." However, Investigator Rowland noted that inmates were aware that their mail was monitored.

Dr. John Davis testified that he was a forensic pathologist and that he performed the victim's autopsy. Dr. Davis concluded that the victim died as a result of homicide. He noted that there were unique blunt force injuries to the back of the victim's head. Based on the shape of the wounds, Dr. Davis concluded that the wounds were made by "a hard, heavy object swung with some force. It would have at least a semi-circular edge on one side." Dr. Davis stated that the hammer found in the woods outside of Mr. Muncey's apartment was consistent with the type of object that would have inflicted the victim's injuries. However, Dr. Davis stated that he could not say whether that hammer was the particular instrument which caused the victim's injuries; he could only conclude that it was consistent.

On cross-examination, Dr. Davis stated that he concluded that the victim died on November 18 or 19, 2011, but he could not determine time of death with greater specificity. Dr. Davis also could not tell whether the victim was hit in the head before he was "dumped in the river[.]" Additionally, Dr. Davis said there was no sign that the victim tried to fight off his attacker. He further stated that the victims' injuries could not have been caused by being hit with the handle of a pistol. The injuries were caused with something that was "more dense and hard than a pistol grip" and that was circular in shape.

After deliberation, the jury convicted the Defendant of first degree premeditated murder in Count 1, first degree felony murder in Count 2, and the lesser-included offense of facilitation of especially aggravated robbery in Count 3. The convictions in Counts 1 and 2 were merged, and the Defendant's thirty-year sentence in Count 3 was ordered to run concurrently with his sentence in Count 1. Accordingly, the trial court imposed an effective sentence of life. This timely appeal followed.

*Analysis*

The Defendant contends that the evidence was insufficient to support his convictions for first degree premeditated murder and first degree felony murder. Our standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); see also Tenn. R. App. P. 13(e). Questions of fact, the credibility of witnesses, and weight of the evidence are resolved by the fact finder. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978), *superseded on other grounds by* Tenn. R. Crim. P. 33 *as stated in State v. Moats*, 906 S.W.2d 431, 434 n.1 (Tenn. 1995). This court will not reweigh the evidence. *Id.* Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted). A guilty verdict removes the presumption of innocence, replacing it with a presumption of guilt. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The defendant bears the burden of proving why the evidence was insufficient to support the conviction. *Bland*, 958 S.W.2d at 659; *Tuggle*, 639 S.W.2d at 914. On appeal, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." *State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007).

The Defendant first argues that there was insufficient evidence to prove premeditation for first degree premeditated murder. First degree premeditated murder is "[a] premeditated and intentional killing of another[.]" Tenn. Code Ann. § 39-13-202(a)(1). "'Intentional' means that a person acted intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-106(a)(18). As defined in the code,

> "[P]remediation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Tenn. Code Ann. § 39-13-202(d). Because a defendant's mental state at the time of the offense is often difficult to discern, "Tennessee courts frequently look to circumstances

surrounding the killing in order to determine if the proof is sufficient to support a jury's finding of premeditation." *State v. Larkin*, 443 S.W.3d 751, 815 (Tenn. Crim. App. 2013) (citing *State v. Jackson*, 173 S.W.3d 401, 408 (Tenn. 2005); *State v. Young*, 196 S.W.3d 85, 108 (Tenn. 2006); *State v. Vaughn*, 279 S.W.3d 584, 594-95 (Tenn. Crim. App. 2008)). Such circumstances include:

> the use of a deadly weapon upon an unarmed victim; lack of provocation by the victim; the accused's declarations of an intent to kill; the accused's failure to render aid to the victim; facts indicative that the accused had a motive to kill the victim; the particular cruelty of the killing; the accused's procurement of a weapon prior to the killing; preparations to conceal the crime before the crime is committed; destruction or secretion of evidence of the killing; and the accused's calmness immediately after the killing.

*Id.* (citing *State v. Thacker*, 164 S.W.3d 208, 222 (Tenn. 2005); *State v. Bland*, 958 S.W.3d 651, 660 (Tenn. 1997); *State v. Lewis*, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000)). Additionally, when combined with other of these circumstances, proof of repeated blows to the victim is relevant to establish premeditation. *Id.*

In this case, the victim was struck three times in the back of the head with a hard, dense object that was consistent in shape with the sledge hammer found in the woods outside Mr. Muncey's apartment. Prior to the killing the Defendant had asked Mr. Muncey and Mr. Cobb to assist him in robbing the victim. When they refused to help, the Defendant told Mr. Muncey that "he'd just go kill him then and do it himself." A few days later, the Defendant told Mr. Muncey that he had "thr[own] a hammer beside [Mr. Muncey's] apartment" and that "he needed to find it because it ha[d] his old lady's initials on it." Additionally, the Defendant contacted Ms. Parker several times, via phone and letter, to tell her that something had her name on it and that she needed to find an object in the wooded area outside of Mr. Muncey's apartment and dispose of it in a "pond/lake." A sledge hammer was found in the wooded area outside Mr. Muncey's apartment with "Nina," the Defendant's girlfriend's name, carved into the head of the hammer, and presumptive tests revealed blood on the hammer. Such evidence was sufficient for the jury to conclude that the Defendant acted with premeditation when he killed the victim. To the extent that the Defendant argues that the evidence from Mr. Cobb and Mr. Muncey was "self-serving and calculated," we note that we that the credibility of witnesses is resolved by the jury, and we will not review credibility findings on appeal. *See Cabbage*, 571 S.W.2d at 835.

The Defendant also argues that there was insufficient evidence to support his conviction for first degree felony murder because there was insufficient evidence for the underlying felony, robbery. As charged in this case, first degree felony murder is "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . .

robbery[.]" Tenn. Code Ann. § 39-13-202(a)(2). "Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a).

> "Knowing" means that a person acted knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result.

Tenn. Code Ann. § 39-11-106(a)(20). "Intentional" is defined above.

As noted above, the Defendant asked Mr. Cobb and Mr. Muncey for assistance in his plan to rob the victim of money the victim had received from a social security disability payment. The Defendant planned to make the transaction look like a drug deal gone bad. Ms. Craven testified that she gave the victim $1,300 and a handgun in the days before he disappeared, and the victim bought ammunition for a .38 Special caliber weapon. Additionally, when she reported him missing, Ms. Thompson said the victim had left with money and a gun. The victim did not have any money or the gun when his body was discovered. Within days of asking for help robbing the victim, the Defendant arranged to sell a .38 Special Charter Arms firearm to Mr. Cobb and Mr. Muncey. When they executed this transaction, Mr. Cobb saw the Defendant with approximately $1,000 in cash in his wallet. Mr. Cobb had never known the Defendant to have that much money. Additionally, around 5:00 p.m. on the day the murder was alleged to have occurred, the Defendant paid for a purchase with a $100 bill. Such evidence was sufficient for the jury to conclude that the Defendant intended to take property from the victim by use of violence or fear and that the victim died in the perpetration of that robbery. The Defendant is not entitled to relief.

Based on the foregoing analysis, we affirm the judgments of the trial court.

_____
THOMAS T. WOODALL, PRESIDING JUDGE